PEOPLE v BENDER

Docket No. 102520. Argued January 10, 1996 (Calendar No. 7). Decided July 23, 1996. Rehearing denied 453 Mich 1204.

Jamieson T. Bender and Scott A. Zeigler each were charged in the Oakland Circuit Court with three counts of breaking and entering an occupied dwelling and one count of breaking and entering a house under construction. The court, John N. O'Brien, J., suppressed the defendants' postarrest statements to the police on the ground that each was not informed that counsel had been retained before the statement was given and thus that the statement was made without a knowing waiver of the right to counsel. The Court of Appeals, JANSEN and E. SOSNICK, JJ. (WEAVER, P.J., not participating), affirmed, holding that the rights afforded under Const 1963, art 1, § 17 are extended to include information of a retained counsel's efforts to contact a suspect (Docket No. 162477). The people appeal.

In an opinion by Chief Justice BRICKLEY, joined by Justices LEVIN, CAVANAGH, and MALLETT, the Supreme Court *held*:

The police must inform a suspect that a retained attorney is immediately available for consultation, and the failure to do so per se, before a confession is obtained, precludes a knowing and intelligent waiver of the rights to remain silent and to counsel.

It is difficult to accept and constitutionally justify a rule of law that accepts that law enforcement investigators, as part of a custodial interrogation, can conceal from suspects that counsel has been made available to them and is at their disposal. If it is deemed to be important that the accused be informed of entitlement to counsel, it is certainly important that the accused be informed that counsel has been retained. Our system of criminal justice requires the state to err on the side of protecting the constitutional rights of the accused. The rule adopted today requiring police to inform suspects that counsel has been retained insures that our system of criminal justice remains accusatorial and not inquisitorial in nature and demonstrates that the good will of state agents is often insufficient to guarantee a suspect's constitutional rights.

Justice CAVANAGH, joined by Justices LEVIN and MALLETT, additionally stated:

The Michigan Constitution imposes a stricter requirement for a valid waiver of the rights to remain silent and to counsel than imposed by the federal constitution. In order for a defendant to fully comprehend the nature of the right being abandoned and the consequences of the decision to abandon, the defendant first must be informed that counsel has been retained. The right to counsel becomes meaningless if a suspect cannot communicate with an attorney or can speak with the attorney only after giving a statement. The inherently coercive nature of incommunicado interrogation requires a rule per se that can be implemented with ease and practicality to protect a suspect's rights to remain silent and to counsel. The attorney's physical presence at a police station is not required.

In this case, both defendants' statements were taken in violation of their Michigan constitutional rights to remain silent and to counsel. The police failed in their duty to inform them that their attorneys attempted to contact them before they made their statements, information crucial to making a knowing and intelligent waiver.

Affirmed and remanded for further proceedings.

Justice BOYLE, joined by Justices RILEY and WEAVER, dissenting, stated that there is no support in the Michigan Constitution for the rule announced by the majority.

The warnings and rights delineated in *Miranda* are not constitutionally required, and the rights to counsel and to remain silent are suggested only as one possible formula for dispelling the coercive atmosphere of custodial interrogation. A right to remain silent is not the same as the right to be free from compelled self-incrimination. The Fifth Amendment precludes only compelled self-incrimination and does not guarantee a right to silence. The corresponding guarantee against compelled self-incrimination in art 1, § 17 of the Michigan Constitution provides no greater protection than the Fifth Amendment. There is no justification, compelling or otherwise, for construing these identical provisions differently.

A suspect may waive *Miranda* rights as long as the waiver is voluntary and knowing and intelligent. Outside events, such as the presence of counsel, have no effect on whether a waiver of *Miranda* rights is voluntary or knowing and intelligent. *Miranda* advice is not an abstract offer to call some unknown lawyer; it is an offer to have an attorney of one's choice present during questioning. The privilege against self-incrimination is personal and may not be invoked by a third party. The prophylactic protections created by *Miranda* were intended to protect suspects, not their families, their principals in crime, or their attorneys.

In these cases, there is no question that the defendants understood their rights under *Miranda* and knowingly and intelligently waived them. That there were outside developments, unknown to the defendants, had no bearing on whether the waivers were constitutionally sufficient. No societal goal is served by protecting the defendants against the consequences of their own intelligent choices. Nor is it desirable to suppress truthful statements, voluntarily made, that aid in a criminal prosecution.

208 Mich App 221; 527 NW2d 66 (1994) affirmed.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Richard Thompson*, Prosecuting Attorney, *Joyce F. Todd*, Chief, Appellate Division, and *Kathryn G. Barnes*, Assistant Prosecuting Attorney, for the people.

*Miro, Miro & Weiner* (by *Matthew F. Leitman*) and *Condit, McGarry & Schloff, P.C.* (by *Alexander B. McGarry*), for Bender.

*Benjamin & Goldfine* (by *Allan Z. Goldfine*) for Zeigler.

Amici Curiae:

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief, Research, Training and Appeals, and *Jeffrey Caminsky*, Assistant Prosecuting Attorney, for the Wayne County Prosecutor.

*Paul J. Denenfeld* for American Civil Liberties Union Fund of Michigan and *David A. Moran* for Criminal Defense Attorneys of Michigan.

*Michael D. Thomas*, President, *John D. O'Hair*, Prosecuting Attorney, and *Timothy A. Baughman*,

Chief, Research, Training and Appeals, for Prosecuting Attorneys Association of Michigan.

CAVANAGH, J. In this case, we are asked to consider whether, under Michigan law, a suspect's waiver of his rights to remain silent and to counsel is valid when the police fail to inform him, before he gives a statement, that a specific, retained attorney is immediately available to consult with him. We hold that Const 1963, art 1, § 17 requires the police to inform the suspect that a retained attorney is immediately available to consult with him, and failure to so inform him before he confesses per se precludes a knowing and intelligent waiver of his rights to remain silent and to counsel.[1]

---

[1] Contrary to the demagogic opinion of the dissent, our goal is not to eliminate "confessions from the arsenal of society's weapons against crime." *Post* at 624. Nor will our rule necessarily result in the reversal of convictions as the dissent alleges. Rather, we believe that confessions are not only a valid, but also an essential part of law enforcement. However, we would go one step beyond the dissent and also concern ourselves with how law enforcement obtained the confession. More importantly, if law enforcement officers adhere to the rule we announce today, there will be no reversal of convictions on the basis of failure by officers to inform the suspect that his counsel wished to speak with him before he made a confession. Thus, if law enforcement does not follow this rule, it will be a government agent, and not this Court, that is responsible for thwarting and hampering cases of urgent social concern as referenced in the dissent's n 3.

Additionally, the dissent's argument that our rule will thwart or substantially hamper prosecution in certain cases has no merit:

"This argument is not supported by any reference to the experience in the states that have adopted this rule." [*Moran v Burbine*, 475 US 412, 460; 106 S Ct 1135; 89 L Ed 2d 410 (1986) (Stevens, J., dissenting).] Prior to *Moran*, a majority of states followed a rule similar to the one we enunciate today, without any apparent diminishment in the effectiveness of their law-enforcement agencies. In the states, since 1986, that have rejected *Moran* (e.g., Connecticut, Delaware, Florida, Oregon), no evidence exists that the police have been seriously hindered in their efforts to uphold the law. [*State v Reed*, 133 NJ 237, 265; 627 A2d 630 (1993).]

### I. FACTS AND PROCEDURAL HISTORY

During the early morning hours of August 2, 1991, bicycles were taken from two separate residences, and a sink was removed from a house that was under construction. Bloomfield Township Police Officer Steven Currie arrived at one of the locations at 3:33 A.M. A canine unit arrived, and at approximately 4:00 A.M. defendant Jamieson Bender was arrested by a canine handler. He was placed in a holding cell at approximately 4:30 A.M.

Officer Currie and Sergeant DeWolfe went to defendant Scott Zeigler's house between 7:00 and 8:00 A.M. Zeigler let the officers into the house and told them that he had loaned his car to Bender, that he knew where his car was located, that he and Bender had taken a couple of bicycles, and that they had taken a sink from a house that was under construction. Zeigler was arrested and then showed Officer Currie where the stolen property was located.

Officer Currie testified that he arrested Zeigler about 8:00 or 8:30 A.M. However, Zeigler's mother, Ruth, who was at the house at the time that Zeigler was arrested, stated that she had called attorney Allan Goldfine at 6:45 A.M. Mr. Goldfine agreed to represent Zeigler and told her to go to the police station and tell Zeigler not to talk to anyone until Zeigler first talked to him. Thus, she went to the police station at 7:15 A.M., talked to Officer Currie, and asked to see her son.[2] When he refused, she told Officer Currie that she had a message for her son from his attorney.

---

[2] The transcripts of the *Walker* (*People v Walker* [*On Rehearing*], 374 Mich 331; 132 NW2d 87 [1965]) hearing of February 4, 1993, indicate what occurred at the time defendant Zeigler's mother went to the station to relay the attorney's message. The questions are by Mr. Goldfine, defend-

Officer Currie, however, told Ruth that she could not see her son, that she could not get a message to him, and that she could not stay and talk to the detective.[3]

---

ant Zeigler's attorney, and the answers were given by defendant Zeigler's mother.

*Q.* And then what did you do?

*A.* I went in and when I went to the police station, the woman went and got the officer that had arrested Scott. And I think his name is Currie. . . . And I asked him if I could see Scott.

\*     \*     \*

Anyway, and he said no, that I couldn't see him. And I stood there awhile longer, and I said, "Well, I have a message for him from our lawyer, and he said it was important that I talk to him before he was questioned."

And he said, "No," he said, "You'll have to wait." He said, "The detectives aren't even in yet."

And I asked if I could wait until the detective came in and talked to the detective and he said no.

And he told me that I could go and get Scott's car because Scott's car was still over in the neighborhood.

So we went and got Scott's car. He wrote down the detective's phone number and name for me so that I could call him about 10:30 or 11.

*Q.* So let me be sure I'm clear. He said that you could not stay and wait to talk to the detective?

*A.* Right, and that I couldn't see Scott.

*Q.* And that you could not get a message to him?

*A.* Right.

*Q.* And what was the message that you wanted to deliver to him?

*A.* To not talk until he had had a chance to talk to you.

[3] Officer Currie recalled that he spoke to an older woman in the station and that she identified herself as the mother of one of the defendants. However, in contrast to Ruth's testimony, Officer Currie stated that Ruth wanted to see her son, but he told her that her son was with the detectives and she could see him when they were finished. Because the trial court suppressed defendant Zeigler's statement, the trial court implicitly found that Ruth was more credible than Officer Currie in her testimony given in this regard. As a reviewing court, we give deference to the trial court's ability to view evidence, and we will not reverse findings unless they are clearly erroneous. *People v Johnson,* 202 Mich App 281; 508

A police officer called Bender's mother, Kathleen, about 5:30 A.M. to inform her of her son's arrest. She then contacted Bender's father, Phillip, who was residing out of state. Phillip called the police station at 7:00 A.M. and asked to speak with his son. When the officer refused, Phillip told him that he was going to get counsel for his son immediately. He then called attorney Elizabeth Pezzetti who agreed to represent Bender.

Ms. Pezzetti called the police station at approximately 9:00 A.M. and asked to speak with Bender and the detective in charge as soon as possible. The officer who answered the telephone told Ms. Pezzetti that Bender was being held, but that his paperwork had not been completed and that she would tell the detective that Ms. Pezzetti wished to speak with him and Bender. The detective did not return her call, so Ms. Pezzetti called the station again at 10:00 A.M., and was also unsuccessful. Detective Genereaux finally returned Ms. Pezzetti's call between 11:00 and 11:30 A.M. He stated that he had talked to both defendants, that they had been cooperative, and that they would be released without bond to their parents. Ms. Pezzetti stated that had she been given the opportunity to speak with Bender, she would have told him not to talk to anyone and that she would be at the station.

Without informing either defendant of his attorney's attempted contacts, Detective Genereaux interrogated both defendants. Zeigler was interrogated first. He read aloud and signed a *Miranda*[4]-warnings form at 9:08 A.M., and gave his statement during the subse-

---

NW2d 509 (1993); *People v Etheridge,* 196 Mich App 43; 492 NW2d 490 (1992).

[4] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

quent thirty- to forty-minute interview. Next, Bender was interviewed and also read aloud and signed a *Miranda*-warnings form at 9:50 A.M. His interview also lasted between thirty and forty minutes.

Each defendant testified regarding his statement. Zeigler was twenty years old, had no prior contacts with the police, and was a college student. On the night in question, he had been drinking beer, although Detective Genereaux stated that he saw no signs of intoxication. Zeigler stated that he was not given the opportunity to make a telephone call. He was not offered food or water, and he had not slept for about twenty-six hours.

Bender was also twenty years old, had no prior contacts with the police, and was attending college. He had also been drinking that night. He was not given food or water and had not slept for about twenty-five hours. When he was being fingerprinted, he asked to make a telephone call, but he was told that he could make a telephone call later. He was never given that opportunity. Bender testified that he thought he would have to remain in a holding cell if he requested an attorney.

It is undisputed that Bender was never informed by the police that Ms. Pezzetti had attempted to call him and had been retained for him. It is also undisputed that Zeigler's mother was not permitted to see her son and that no message was given to Zeigler that she had retained an attorney for him. Both defendants stated that they understood the *Miranda*-warnings form, and neither requested counsel before or during the interviews.

On the basis of the evidence given at the *Walker* hearing, the trial court ruled that the conduct of the

police had not been reprehensible and that each defendant had made a voluntary statement with full knowledge of his *Miranda* rights. However, the trial court ruled that the postarrest statements had to be suppressed because the defendants were not informed that counsel had been retained for them before the statements were given and that the statements were, therefore, made without a knowing waiver of the right to counsel. The trial court made this ruling on the basis of *People v Wright*, 441 Mich 140; 490 NW2d 351 (1992).

On appeal, the Court of Appeals affirmed. 208 Mich App 221, 232; 527 NW2d 66 (1994). The Court of Appeals stated:

> [W]e extend the rights afforded under Const 1963, art 1, § 17 to include information of retained counsel's efforts to contact a suspect. We believe that such a protection is necessary to allow suspects in custody to make a knowing, intelligent, and voluntary waiver of their right to counsel and right to remain silent. Therefore, the trial court did not err in suppressing defendants' postarrest statements where the police failed to inform them that counsel had been retained and of counsel's attempts to contact them.

We agree with the analysis of the Court of Appeals and, therefore, affirm its holding that the suppression of both defendants' statements was proper.

## II. WAIVER OF RIGHT TO COUNSEL

The Fifth and Fourteenth Amendments of the United States Constitution protect a defendant's federal rights to remain silent and to counsel.[5] Addition-

---

[5] We acknowledge that the right to remain silent and to counsel are not found in the actual text of either the Fifth or Fourteenth Amendments.

ally, the Michigan Constitution protects a defendant's corresponding state rights. Const 1963, art 1, § 17.[6]

In *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." While the Court in *Miranda* required procedural safeguards, it also recognized that the defendant may waive his rights to remain silent and to counsel. Thus, it also required that the waiver be made voluntarily, knowingly, and intelligently. *Id.*, citing *Escobedo v Illinois*, 378 US 478, 490, n 14; 84 S Ct 1758; 12 L Ed 2d 977 (1964), and *Johnson v Zerbst*, 304 US 458; 58 S Ct 1019; 82 L Ed 1461; 146 ALR 357 (1938). See also *People v Paintman*, 412 Mich 518; 315 NW2d 418 (1982).

---

However, in *Miranda,* the United States Supreme Court created a set of warnings, which included a right to remain silent and a right to counsel during interrogation, which ensure protection of a defendant's right against compulsory self-incrimination. Exercising a right to remain silent is the most basic way for a defendant to assert his constitutional right to be free from compelled self-incrimination. Thus, if officers extract a confession from a defendant in violation of *Miranda,* and in the process he incriminates himself, the basis for the suppression of the statement is the Fifth Amendment applied to the states through the Fourteenth Amendment. It is in this context that we conclude that these amendments protect a defendant's federal rights to remain silent and to counsel.

[6] Const 1963, art 1, § 17 provides:

No person shall be compelled in any criminal case to be a witness against himself . . . .

The right to counsel before and during interrogation is an ancillary right to the privilege against compelled self-incrimination.

Whether the waiver is valid involves a two-part inquiry. First, the waiver must be a "product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v Burbine*, 475 US 412, 421; 106 S Ct 1135; 89 L Ed 2d 410 (1986). Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*[7]

In the instant cases, neither defendant claims that procedural safeguards were not heeded. In fact, both defendants signed a *Miranda* waiver form.[8] Because there was no evidence of police coercion, we agree with the trial court that neither defendant's statement was involuntary, and thus need not be suppressed for that reason. *People v Reed*, 393 Mich 342; 224 NW2d 867 (1975).[9] However, the defendants contend that

---

[7] In *Miranda* at 476, the Court emphasized:

[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.

[8] The form contains a list of the *Miranda* warnings. Additionally, it contains a "Consent to Speak" section, which states:

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me; no pressure or coercion of any kind has been used against me.

Defendant Zeigler's form was signed and dated August 2, 1991, at 9:08 A.M. Defendant Bender's form was likewise signed and dated August 2, 1991, at 9:50 A.M.

[9] A confession is voluntary if it is the product of a free choice. *People v Marshall*, 204 Mich App 584; 517 NW2d 554 (1994); *People v Cipriano*,

their statements must be suppressed because the police failed to inform them of their attorneys' attempts to contact them, which deprived them of the information necessary to make a knowing and intelligent waiver of their rights to remain silent and to counsel under Const 1963, art 1, § 17.

### III. RELEVANT CASE LAW

### A. FEDERAL

Although today we base our decision solely on independent state grounds, we recognize that the United States Supreme Court decided a similar issue in *Moran*, wherein defendant asserted a violation of his federal rights. In *Moran*, the defendant was arrested by police for his alleged participation in a local burglary. Shortly before his arrest, a confidential informant gave the local police information that led them to believe that the defendant had committed a murder in another city several months earlier. The local police attempted to persuade the defendant to execute a written waiver form, but he refused. The officers then questioned the codefendants about the burglary, and they further implicated the defendant in the murder. The local police then contacted the police from the jurisdiction where the murder occurred, and within an hour officers arrived to question him regarding the murder.

---

431 Mich 315; 429 NW2d 781 (1988). The voluntariness of a confession is a question for the trial court. *Marshall, supra.* However, the appellate court examines the entire record and makes an independent determination of voluntariness. *People v Etheridge,* n 3 *supra.* We give deference to the trial court's ability to view the evidence and will not reverse findings unless they are clearly erroneous. *Johnson* and *Etheridge,* n 3 *supra.* Here, we agree with the findings made by the trial court, and similarly conclude that the defendants' statements were voluntary.

When the defendant's sister learned that her brother had been arrested on suspicion of burglary, she contacted the public defender's office and requested representation for her brother. An attorney assigned to represent the defendant immediately contacted the local police and requested to speak to her client before he was questioned or placed in a lineup. The officer who answered her call assured her that they were through with the defendant for the evening. The defendant's attorney was not informed that the defendant was also under suspicion for murder and that another jurisdiction's police officers were at the local station to question him regarding that matter.

In fact, later that evening the police questioned the defendant regarding the murder. He signed written waiver forms and fully confessed to the murder in three separate statements. The defendant was not informed, before he confessed, that his sister had secured counsel for him or that his attorney had contacted the local police department seeking to speak with him.

In a six to three decision, the Court held that the federal constitution did not require the exclusion of the three inculpatory statements. *Id.* at 434. The Court reasoned that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422. The Court further reasoned:

> Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to

secure a conviction, the analysis is complete and the waiver is valid as a matter of law. [*Id.* at 422-423.]

The Court concluded that because the defendant voluntarily confessed with full awareness and comprehension of his *Miranda* rights, the waivers were valid.

While the Court based its holding on its interpretation of the federal constitution, it explicitly recognized that "[n]othing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law."[10] *Id.* at 428.

### B. OTHER STATES

In fact, many states that have considered this issue have held that, as a matter of state law, the police must inform the suspect that his attorney is immediately available to consult with him.[11] And, although the states have provided different rationales for imposition of this duty, "they agree on one supervening principle: the atmosphere of custodial interrogation is inherently coercive and protecting the right against self-incrimination entails counteracting that coercion." *State v Reed*, 133 NJ 237, 255; 627 A2d 630 (1993).

For example, in *State v Stoddard*, 206 Conn 157; 537 A2d 446 (1988), the Supreme Court of Connecti-

---

[10] In light of this statement by the Court, Justice BOYLE's assertion that "[t]he Court could not and did not address the authority of state supreme courts to interpret their own governing law" is inexplicable. *Post* at 640.

[11] Further, as noted by the *Moran* dissent, the rule that the majority created, and the instant dissent advocates, "quite clearly violates the American Bar Association's Standards for Criminal Justice . . . ." See *Moran* at 440-441 and n 11.

cut determined, on facts similar to the instant case, that the defendant's statement must be suppressed. In *Stoddard*, the defendant was arrested on suspicion of murder. Immediately following the defendant's arrest, his girlfriend contacted an attorney who agreed to represent the defendant. On the day of the arrest, the attorney contacted the police department three times, requesting to speak with the defendant, but was incorrectly told each time that the defendant was not there. Early the next morning, the attorney called the station for a fourth time and was again told that the defendant was not there. Later that morning, the defendant confessed to the murder, still unaware that his attorney had repeatedly attempted to contact him.

The court, adopting a totality-of-the-circumstances test, held that "the state has not met its burden of proving by a preponderance of the evidence that the efforts of counsel, if properly communicated, would not have altered the defendant's appraisal and understanding of the circumstances." *Id.* at 176-177. Thus, the trial court had erred in failing to suppress the confession. The court reasoned that the duty to inform only requires the police to act as a neutral conduit for the pertinent and timely requests by the attorney to speak with a custodial suspect. In addition, the court found that the attorney's attempts to communicate with the suspect were constitutionally significant with regard to whether the suspect's waiver was knowingly and intelligently made.

In another case with similar facts, the Supreme Court of New Jersey determined that the trial court had erroneously admitted the defendant's confession. In *Reed*, the defendant confessed to murder and criminal sexual contact, which became evidence crucial in

the case against him. However, the police had refused before and during the defendant's interrogation to inform him that his friend had hired an attorney to represent him, and that the attorney had been present at police headquarters and had attempted to speak with the defendant before he confessed.

The court held that, under New Jersey law,

> when, to the knowledge of law-enforcement officers, an attorney has been retained on behalf of a person in custody on suspicion of crime and is present or readily available to assist that person, *the communication of that information to the suspect is essential to making a knowing waiver of the privilege against self-incrimination,* and withholding that information renders invalid the suspect's waiver of the privilege against self-incrimination. [*Id.* at 269 (emphasis added).]

The court reasoned that its holding was essential to effectuate the defendant's right to counsel, which in turn effectuates the right to remain silent.[12] While acknowledging that its decision placed a further burden on police when dealing with criminal suspects,

---

[12] Further, the court cited with approval a case interpreting *Miranda*, which had explained:

"The rule in *Miranda*, however, was based on this Court's perception that the lawyer occupies a critical position in our legal system because of his unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation.

\*     \*     \*

"Whether it is a minor or an adult who stands accused, the lawyer is the one person to whom society as a whole looks as the protector of the legal rights of that person in his dealings with the police and the courts." [*Id.* at 262, quoting *Fare v Michael C,* 442 US 707, 719; 99 S Ct 2560; 61 L Ed 2d 197 (1979).]

the court reasoned that the duty to inform is narrow and specific. It only arises when the attorney who has been retained to represent the suspect in custody communicates his presence or immediate availability and desire to speak with the suspect to an agent of the police department.

Similarly, in *People v McCauley*, 163 Ill 2d 414; 645 NE2d 923 (1994), the Supreme Court of Illinois affirmed the trial court's order suppressing the defendant's statement and the lineup identification on the basis of state law. In *McCauley*, the defendant was questioned regarding his possible involvement in a homicide. He denied involvement and provided an alibi. After police officers left the station to investigate his alibi, the defendant's family hired an attorney to represent him. The attorney proceeded to the station where the defendant was being held, but the officer told the attorney that he could not speak with the defendant, and that the officer would not tell the defendant that his lawyer was present in the station. Later, the defendant was identified in a lineup.

The court held that the trial court properly suppressed the defendant's statement and lineup identification because it resulted from a violation of state constitutional protections, where the police denied the attorney access to the defendant and failed to inform him that the attorney was present, available, and seeking to consult with him. The court reasoned that "[i]f a defendant is entitled to the benefit of an attorney's assistance and presence during custodial interrogation and this right is guarded, certainly fundamental fairness requires that immediately available assistance and presence not be denied by police authorities." *Id.* at 444. The court also concluded

that, on the basis of state law the police conduct violated the defendant's right to remain silent.

## IV. THE MICHIGAN RULE

In *Wright*, this Court held that the Michigan Constitution imposes a stricter requirement for a valid waiver of the rights to remain silent and to counsel than imposed by the federal constitution.[13] *Wright* at 147 (MALLETT, J.), *id.* at 155 (CAVANAGH, C.J., concurring),[14] *id.* at 170 (BRICKLEY, J.,

---

[13] I wholeheartedly disagree with the dissent's assertion that "*Wright*[ ] only examined whether failure to inform a suspect that an attorney wished to contact him rendered the confession involuntary, but said nothing about the knowing and intelligent prong of the waiver requirement." *Post* at 652, n 19.

We emphasize that all the cases that this Court approvingly cited in *Wright* discussed the knowing and intelligent prong. Although that prong was considered throughout the opinion, the best example of its consideration can be found in our conclusion in *Wright*.

> Because we believe that Mr. Wright should have been informed of counsel's in-person attempts to contact him in order to *knowingly* and voluntarily waive his Fifth Amendment rights, we reverse the Court of Appeals decision, and order a new trial at which defendant's statements to the police are to be suppressed. We find that Mr. Wright's confession, made without this *knowledge*, violated the rights afforded under the Michigan Constitution. Statements made under such circumstances are neither voluntarily nor *knowingly* made, and therefore cannot be used against a defendant. Deliberate subterfuge by the police to prevent counsel from contacting a suspect is reprehensible and unconstitutional. Mr. Wright, under this state's constitution, was entitled to such *knowledge* in order to make an informed decision regarding his rights. [*Id.* at 155 (emphasis added).]

Although only three justices endorsed the knowing and intelligent prong analysis in *Wright*, to say that it says nothing about that prong is a definite mischaracterization of *Wright* and is clearly unsupportable.

[14] In *Wright*, I agreed with Justice MALLETT that Const 1963, art 1, § 17 should be interpreted more broadly than the United States Supreme Court interpreted the Fifth Amendment in *Moran*. However, there I wrote separately to express my view that Const 1963, art 1, § 20, corresponding to the Sixth Amendment right to counsel, more clearly supported suppres-

concurring).[15] Under federal law, a waiver is know-
ingly and intentionally made where no police coer-
cion was involved and where the defendant under-
stands that he has the right to remain silent and that
the state intends to use what he says to secure a con-
viction. *Moran* at 422-423. We agree that those cir-
cumstances are a minimal prerequisite to a valid
waiver; however, in Michigan, more is required before
the trial court may find a knowing and intelligent
waiver.[16] We believe that in order for a defendant to

---

sion of the defendant's statement. *Wright* at 155-156 (Cavanagh, C.J., con-
curring). Because today a majority agrees that § 17 requires suppression
of the defendants' statements, we need not decide whether § 20 would
also require suppression. That question is left open for another day.

[15] In *Wright*, Justice Brickley stated:

Incommunicado interrogation . . . poses serious dangers to the
voluntariness of an accused's waiver of the right to remain silent.
*No issue of incommunicado interrogation can arise where the
police inform a suspect that a retained attorney is present and
immediately available.* An accused, fully informed of his right to
remain silent and to have counsel present, in the exercise of his
judgment may choose to proceed with or without counsel. In that
circumstance, the choice belongs to and is made by the accused
and not the police. Thus, the careful balance of the interests of
legitimate law enforcement and the interest of individuals embod-
ied in the Michigan Constitution remains intact. [*Id.* (emphasis
added).]

[16] As support for this conclusion, we adopt the reasoning of the New
Jersey Supreme Court in *Reed*.

[I]nforming a suspect of the right to the presence of an attorney
is qualitatively different from informing a suspect of both the right
to the presence of an attorney and that the attorney is already in
the stationhouse. In the first instance, the suspect may reject the
offer out of fear that the police will interpret the request for an
attorney as an acknowledgment of guilt, or the suspect may view
with skepticism the offer by police to provide an unknown attor-
ney. But if the attorney is already present, the same suspect may
conclude that consultation with the attorney outweighs any risk of
antagonizing the police, particularly if the suspect has had a prior
relationship with the attorney or if friends or family have retained
the attorney. Thus, the presence and availability of a retained attor-

fully comprehend the nature of the right being abandoned and the consequences of his decision to abandon it, he must first be informed that counsel, who could explain the consequences of a waiver decision, has been retained to represent him.[17]

---

ney is critical information that qualitatively affects the exercise by a suspect of the right to consult with counsel. When that information is withheld, the suspect's waiver of the right to counsel and to remain silent is more abstract than real, becoming, in effect, a waiver of a theoretical right that is uninformed by the material knowledge that retained counsel, present and available to assist the suspect in the full exercise of his or her rights, is just outside the door. That the suspect may ultimately reject the offer and waive his or her right is irrelevant to whether the uninformed waiver is knowing and intelligent. [*Reed* at 274 (citations omitted).]

In addition, we also adopt the reasoning of the Connecticut Supreme Court in *Stoddard.*

We are unwilling . . . to dismiss counsel's effort to communicate as constitutionally insignificant to the capacity of the suspect to make a knowing and intelligent choice whether he or she will invoke the right to counsel. *Miranda* warnings refer only to an abstract right to counsel. That a suspect validly waives the presence of counsel "only means that for the moment the suspect is foregoing the exercise of that conceptual privilege." Faced with a concrete offer of assistance, however, a suspect may well decide to reclaim his or her continuing right to legal assistance. "To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second." We cannot therefore conclude that a decision to forego the abstract offer contained in *Miranda* embodies an implied rejection of a specific opportunity to confer with a known lawyer. Accordingly, the lack of authority of counsel to invoke the personal right of the suspect is no bar to the imposition of a duty to inform a suspect of counsel's efforts. [*Stoddard* at 168 (citations omitted).]

[17] The dissent asserts that Const 1963, art 1, § 17 provides no greater protection than the Fifth Amendment. However, this statement, as a general rule for this Court to follow, is clearly unsupportable.

In *People v Nash*, 418 Mich 196; 341 NW2d 439 (1983), this Court considered the history of the drafting of Const 1963, art 1, § 11 (the Michigan analogue to the Fourth Amendment), and concluded that it was drafted

In the instant case, the police failed to inform both defendants that counsel had been retained for them and that their respective attorneys attempted to contact them before making a statement. Thus, we hold that, on the basis of Const 1963, art 1, § 17, neither defendant Bender nor defendant Zeigler made a knowing and intelligent waiver of his rights to remain silent and to counsel, because the police failed to so inform them before they confessed. In so holding, we

---

in direct response to *Mapp v Ohio*, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961). Thus, a majority of this Court reasoned that because of this direct connection to federal law, we should not interpret art 1, § 11 more broadly than the United States Supreme Court interpreted the Fourth Amendment, unless there is a compelling reason to do so.

However, when interpreting art 1, § 17, there is an absence of a direct link to federal interpretation of the Fifth Amendment. Thus, it does not logically follow that in interpreting art 1, § 17, we must find compelling reasons to interpret our constitution more liberally than the federal constitution.

A majority of this Court clearly stated this position in *Sitz v Dep't of State Police*, 443 Mich 744; 506 NW2d 209 (1993):

"[C]ompelling reason" should not be understood as establishing a conclusive presumption artificially linking state constitutional interpretation to federal law. As illustrated by the question presented today, a literal application of the term would force us to ignore the jurisprudential history of this Court in favor of the analysis of the United States Supreme Court announced in *Sitz*. Properly understood, the *Nash* rule compels neither the acceptance of federal interpretation nor its rejection. In each instance, *what is required of this Court is a searching examination to discover what law "the people have made."*

The judiciary of this state is not free to simply engraft onto art 1, § 11 more "enlightened" rights than the framers intended. By the same token, *we may not disregard the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has withdrawn or not extended such protection.* [*Id.* at 758-759 (emphasis added) (citations omitted).]

Thus, in the instant case, we refuse to abdicate our duty to interpret our constitution as our people have made it. We vehemently refuse to restrict ourselves to the federal interpretation announced in *Moran*, and to that which the dissent advocates.

reiterate that our state constitution affords defend-
ants a greater degree of protection in this regard than
does the federal constitution.[18]

If we were to hold otherwise, we would encourage
the police to do everything possible, short of a due
process violation, to prevent an attorney from con-
tacting his client before or during interrogation.[19]
Once the suspect signed the waiver form, police
could interrogate the suspect in isolation, without the
assistance of his own lawyer, even if that lawyer is
making an actual effort to consult with the suspect.[20]

---

[18] The dissent opines that our holding "might also raise serious equal
protection concerns." *Post* at 650. However, we believe that suspects in
the instant defendants' position should not be kept from their own law-
yers just because other suspects do not yet have attorneys at the time of
custodial interrogations. The doctrine of equal protection is society's safe-
guard against discriminatory treatment by governmental agents, and is not
a doctrine that officers may rely on to deprive a suspect of his counsel's
assistance.

[19] As the Court quoted in *Miranda*:

"Decency, security and liberty alike demand that government
officials shall be subjected to the same rules of conduct that are
commands to the citizen. In a government of laws, existence of the
government will be imperilled if it fails to observe the law scrupu-
lously. Our Government is the potent, the omnipresent teacher. For
good or for ill, it teaches the whole people by its example. Crime is
contagious. If the Government becomes a lawbreaker, it breeds
contempt for law; it invites every man to become a law unto him-
self; it invites anarchy. To declare that in the administration of the
criminal law the end justifies the means . . . would bring terrible
retribution. Against that pernicious doctrine this Court should reso-
lutely set its face." [*Id.* at 479-480, quoting *Olmstead v United
States*, 277 US 438, 485; 48 S Ct 564; 72 L Ed 944 (1928) (Brandeis,
J., dissenting).]

[20] In n 14, the dissent criticizes our use of the term the defendants'
"own lawyer," stating that there was no attorney-client relationship in
either case. *Post* at 645. However, in both cases the attorney was hired by
the defendant's family. Thus, in no way can the scenario here be "the pic-
ture of a desperate lawyer attempting to contact a potential client." *Id.*
Because both attorneys were already retained before attempting to con-
tact the defendants, both defendants were "clients" at that point, and not

To encourage this type of police behavior would undermine the safeguards we have established to protect the rights to remain silent and to counsel.[21] If these rights are to mean anything, surely we must be adamant in our protection of them.

Additionally, we decline to adopt a totality-of-the-circumstances test in this situation, but instead adopt a per se rule. As the Supreme Court of Delaware stated in *Bryan v State*, 571 A2d 170, 176 (Del, 1990),

> In evaluating the totality of the circumstances, a court makes a two-part inquiry. First, the waiver must have been voluntary—it must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the waiver must have been made upon "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *However, a purported waiver can never satisfy a totality of the circumstances analysis when police do not even inform a suspect that his attorney seeks to render legal advice.* [Citations omitted; emphasis added.]

"To hold otherwise would be to condone 'affirmative police interference in a communication between an attorney and suspect.'" *Id.*, citing *Moran* at 456, n 42

---

just mere "potential clients." We agree with the New Jersey Supreme Court "that an attorney-client relationship should be deemed to exist under such circumstances between the suspect and an attorney when the suspect's family or friends have retained the attorney or where the attorney has represented *or* is representing the suspect on another matter." *Reed* at 261.

[21] We agree with the *Reed* court that "[o]ur holding is essential to give effect to the right to counsel that, in turn, effectuates the privilege against self-incrimination. Moreover, our holding is supported in large measure by the special and essential role lawyers play in realizing the purpose of the right against self-incrimination." *Id.* at 262. See also n 9. Thus, we reject the dissent's assertion that our holding creates a safeguard for a safeguard, is absurd, and is not required by the Michigan Constitution.

(Stevens, J., dissenting). "When the opportunity to consult counsel is in fact frustrated, there is no room for speculation what defendant might or might not have chosen to do after he had that opportunity." *State v Haynes*, 288 Or 59, 75; 602 P2d 272 (1979). The right to counsel becomes meaningless if a suspect cannot communicate with his attorney or can only speak with him after the suspect has given a statement.[22] Thus, the inherently coercive nature of incommunicado interrogation requires a per se rule that can be implemented with ease and practicality to protect a suspect's rights to remain silent and to counsel.[23]

Further, we do not limit this rule by requiring the attorney's physical presence at the police station.[24] We

---

[22] In *Moran*, the dissent stated:

"If the State may arrest on suspicion and interrogate without counsel, there is no denying the fact that it largely negates the benefits of the constitutional guaranty of the right to assistance of counsel." [*Moran* at 437, n 5 (Stevens, J., dissenting), quoting *Watts v Indiana*, 338 US 49, 59; 69 S Ct 1357; 93 L Ed 1801 (1949) (Jackson, J., concurring in the result).]

[23] As stated in the *Moran* dissent:

Like the failure to give warnings and like police initiation of interrogation after a request for counsel, police deception of a suspect through omission of information regarding attorney communications greatly exacerbates the inherent problems of incommunicado interrogation and requires a clear principle to safeguard the presumption against the waiver of constitutional rights. As in those situations, the police deception should render a subsequent waiver invalid. [*Moran* at 452 (Stevens, J., dissenting).]

[24] The dissent criticizes our opinion, stating that our duty to inform "raises the specter of 'virtual' lawyers, who call, FAX, or E-mail police stations with their desire to contact incarcerated suspects; of clerks, whose job it is to log the moment the communication was received and transmit it promptly; and of judicial hearings to determine whether a given statement was obtained before or after communication." *Post* at 625. However, the dissent's criticism of our rule is not well-founded because the police,

agree that "[a] suspect has a right to know that his attorney wishes to see him whether that request comes over the police station counter, over the telephone, or via messenger." *People v Houston*, 42 Cal 3d 595, 615; 230 Cal Rptr 141; 724 P2d 1166 (1986) (Bird, C.J., concurring in part and dissenting in part).[25] Further, we agree that

> an attorney's diligence can manifest itself in ways other than showing up at the police station. In many situations, a phone call or messenger may well be the most efficient, effective—and most diligent—means of transmitting a message to a client. This is true, for example, when an attorney is (1) engaged in trial, (2) handling an urgent matter for another client, (3) located far from where the suspect is being detained, or (4) delayed by traffic or weather conditions. It is unreasonable to suggest that failing to appear in person indicates a lack of diligence on the attorney's part. [*Id.* at 616.]

We recognize that the rule we announce today may decrease the likelihood that interrogating officers will secure a confession.[26] However, this duty to inform is as necessary as other safeguards we have developed to protect a suspect's rights to remain silent and to

---

as an entity, have the fundamental responsibility to establish and maintain adequate procedures that will allow an attorney to communicate with a suspect and the interrogating officers without unreasonable delay. See *Stoddard* at 170 and *State v Haynes*, 288 Or 59, 65-66; 602 P2d 272 (1979).

[25] See *People v Ledesma*, 204 Cal App 3d 682; 251 Cal Rptr 417 (1988) (superseding *Houston* on the basis of legislative action that required that California law could not provide greater protections than the federal protections).

[26] We note that defendant Bender's arresting officer recognized this. When Bender's father told the officer that he was going to immediately call and secure counsel for his son, the officer replied, "Well, why would you want to do that?"

counsel.[27] As the United States Supreme Court stated
in *Escobedo*:

> No system worth preserving should have to fear that if an
> accused is permitted to consult with a lawyer, he will
> become aware of, and exercise, these rights. If the exercise
> of constitutional rights will thwart the effectiveness of a
> system of law enforcement, then there is something very
> wrong with that system. [*Id.* at 490.][28]

---

[27] Chief Justice BRICKLEY implied exactly this in his question to the pros-
ecutor at oral argument. He inquired whether the duty to inform that we
announce here is too much to ask for, as a matter of policy, when we do
so much to ensure the right to, and availability of, counsel.

[28] Further, as stated in *Miranda* at 480-481:

In this connection, one of our country's distinguished jurists has
pointed out: "The quality of a nation's civilization can be largely
measured by the methods it uses in the enforcement of its criminal
law."

If the individual desires to exercise his privilege, he has the right
to do so. This is not for the authorities to decide. An attorney may
advise his client not to talk to police until he has had an opportu-
nity to investigate the case, or he may wish to be present with his
client during any police questioning. In doing so an attorney is
merely exercising the good professional judgment he has been
taught. This is not cause for considering the attorney a menace to
law enforcement. He is merely carrying out what he is sworn to do
under his oath—to protect to the extent of his ability the rights of
his client. In fulfilling this responsibility the attorney plays a vital
role in the administration of criminal justice under our
Constitution.

In announcing these principles, we are not unmindful of the bur-
dens which law enforcement officials must bear, often under trying
circumstances. We also fully recognize the obligation of all citizens
to aid in enforcing the criminal laws. This Court, while protecting
individual rights, has always given ample latitude to law enforce-
ment agencies in the legitimate exercise of their duties. The limits
we have placed on the interrogation process should not constitute
an undue interference with a proper system of law enforcement. As
we have noted, our decision does not in any way preclude police
from carrying out their traditional investigatory functions.

### V. CONCLUSION

On the basis of the foregoing principles, we find that both defendants' statements were taken in violation of their Michigan constitutional rights to remain silent and to counsel. The police failed in their duty to inform them that their attorneys attempted to contact them before they made their statements, information crucial to their making a knowing and intelligent waiver. When the police fail in their duty to inform a suspect of his counsel's attempts to consult with him before he makes a statement, this Court will not speculate what the defendant might or might not have chosen to do after he had the opportunity to consult with his counsel.

We affirm the trial court's suppression of both defendants' statements taken after the police failed to inform them that counsel had been retained for them and of counsels' attempts to contact them. Both types of attempted contact, through telephone calls or through a messenger, satisfy the rule that we adopt today. We remand this case to the trial court for further proceedings.

LEVIN and MALLETT, JJ., concurred with CAVANAGH, J.

BRICKLEY, C.J. (*concurring*). I agree with the result arrived at in the opinion for affirmance, but write separately to express my reasons for doing so.

This case rather clearly implicates both the right to counsel (Const 1963, art 1, § 20) and the right against self-incrimination (Const 1963, art 1, § 17). I conclude that rather than interpreting these provisions, it would be more appropriate to approach the law enforcement practices that are at the core of this case in the same manner as the United States Supreme

Court approached the constitutional interpretation
task in *Miranda* v *Arizona*, 384 US 436; 86 S Ct 1602;
16 L Ed 2d 694 (1966); namely, by announcing a pro-
phylactic rule. See *Michigan v Tucker*, 417 US 433; 94
S Ct 2357; 41 L Ed 2d 182 (1974).

The right to counsel and the right to be free of
compulsory self-incrimination are part of the bedrock
of constitutional civil liberties that have been zeal-
ously protected and in some cases expanded over the
years. Given the focus and protection that these par-
ticular constitutional provisions have received, it is
difficult to accept and constitutionally justify a rule of
law that accepts that law enforcement investigators,
as part of a custodial interrogation, can conceal from
suspects that counsel has been made available to
them and is at their disposal. If it is deemed to be
important that the accused be informed that he is
entitled to counsel, it is certainly important that he be
informed that he has counsel.

As Justice Souter explained in *Withrow* v *Williams*,
507 US 680, 691; 113 S Ct 1745; 123 L Ed 2d 407
(1993):

> "Prophylactic" though it may be, in protecting a defend-
> ant's Fifth Amendment privilege against self-incrimination
> *Miranda* safeguards "a fundamental trial right." The privi-
> lege embodies "principles of humanity and civil liberty,
> which had been secured in the mother country only after
> years of struggle" and reflects

> "many of our fundamental values and most noble aspira-
> tions: . . . our preference for an accusatorial rather than
> an inquisitorial system of criminal justice; our fear that self-
> incriminating statements will be elicited by inhumane treat-
> ment and abuses; our sense of fair play which dictates 'a
> fair state-individual balance by requiring the government to
> leave the individual alone until good cause is shown for dis-

turbing him and by requiring the government in its contest with the individual to shoulder the entire load'; our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life'; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.'" *Murphy* v *Waterfront Comm of New York Harbor*, 378 US 52, 55 [84 S Ct 1594; 12 L Ed 2d 678] (1964) (citations omitted).

Nor does the Fifth Amendment "trial right" protected by *Miranda* serve some value necessarily divorced from the correct ascertainment of guilt. "'[A] system of criminal law enforcement which comes to depend on the "confession" will, in the long run, be less reliable and more subject to abuses' than a system relying on independent investigation." *Michigan* v *Tucker, supra* [417 US] 448, n 23 (quoting *Escobedo* v *Illinois*, 378 US 478, 488-489 [84 S Ct 1758; 12 L Ed 2d 977] [1964]). [Some citations omitted.]

I agree that we invite much mischief if we afford police officers "engaged in the often competitive enterprise of ferreting out crime" the discretion to decide when a suspect can and cannot see an attorney who has been retained for a suspect's benefit. *Giordenello* v *United States*, 357 US 480, 486; 78 S Ct 1245; 2 L Ed 2d 1503 (1958).

At the same time, I do not agree with the dissent that our ruling today necessarily hampers police officers in the performance of their duties. It would have been simple in this case for the police to have complied with the rule we presently announce. To the extent that the burdens may be increased in future cases, I take comfort in the knowledge that, before the United States Supreme Court's ruling in *Moran* v *Burbine*, 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986), many states adhered to the rule we adopt

today and others continue to follow it. Yet, as the majority points out, there is no suggestion that those jurisdictions have been any less successful obtaining confessions than those following the *Moran* rule.

However, even if contrary evidence existed, I am convinced that our decision more fully comports with our most closely guarded legal traditions. Nearly fifty years ago, Justice Jackson discussed the problem we presently face and concluded that our system of criminal justice requires us to err on the side of protecting the constitutional rights of the accused:

> I suppose the view one takes will turn on what one thinks should be the right of an accused person against the State. Is it his right to have the judgment on the facts? Or is it his right to have a judgment based on only such evidence as he cannot conceal from the authorities, who cannot compel him to testify in court and also cannot question him before? Our system comes close to the latter by any interpretation, for the defendant is shielded by such safeguards as no system to law except the Anglo-American concedes to him. [*Watts v Indiana*, 338 US 49, 59; 69 S Ct 1357; 93 L Ed 1801 (1949) (Jackson, J., concurring in part and dissenting in part).]

In my view, the rule we adopt today requiring police to inform suspects that counsel has been retained for them insures that our system of criminal justice remains accusatorial and not inquisitorial in nature. Perhaps more importantly, it demonstrates that experience has taught us that the good will of state agents is often insufficient to guarantee a suspect's constitutional rights.

LEVIN, CAVANAGH, and MALLETT, JJ., concurred with BRICKLEY, C.J.

Boyle, J. (*dissenting*). Today, without a single foundation in the language, historical context, or the jurisprudence of this Court, a majority of the Court[1] engrafts its own "enlightened" view of the Constitution of 1963, art 1, § 17, on the citizens of the State of Michigan. With nothing more substantial than a disagreement with the United States Supreme Court as the basis for its conclusion, a majority of the Court ignores our obligation to find a principled basis for the creation of new rights and imposes a benefit on suspects that will eliminate voluntary and knowledgeable confessions from the arsenal of society's weapons against crime. The obvious and immediate cost of today's result will be the reversal of convictions. The hidden consequences—the cases that will not be brought because confessions that are wholly voluntary and made with full knowledge of *Miranda*[2] cannot be admitted, and the cases brought and lost because the jury never hears the uncoerced words of the defendant on trial—are, if anything, more onerous.[3]

---

[1] Although a majority of the Court concludes that suspects must be told that an attorney is attempting to contact them, even when they have validly declined the invitation to speak with an attorney, four justices cannot agree on the rationale for why this information must be provided. Justices CAVANAGH, LEVIN, and MALLETT believe that such a right is constitutionally required by Const 1963, art 1, § 17, while Chief Justice BRICKLEY creates the obligation by formulating a new prophylactic rule that appears to be an outgrowth of concerns that generated the *Miranda* warnings. *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] *Miranda*, n 1 *supra*.

[3] Prosecution will be thwarted or substantially hampered in cases of urgent social concern, such as domestic abuse, child abuse, sexual abuse, conspiracy to possess, or possess and distribute controlled substances, and myriad other situations in which there is an absence of corroborating physical or documentary evidence.

The lead opinion's characterization of the "narrow and specific"[4] duty to inform frustrates the constitutionally legitimate and societally beneficial purposes of custodial interrogation. It raises the specter of "virtual" lawyers, who call, FAX, or E-mail police stations with their desire to contact incarcerated suspects; of clerks, whose job it is to log the moment the communication was received and transmit it promptly; and of judicial hearings to determine whether a given statement was obtained before or after communication.

By cloaking its assumption that the criminal justice system exists for lawyers and their clients in constitutional garb, a majority of the Court has placed it beyond correction by the Legislature. The fact that this Court has no authority to make policy for the citizens of Michigan does not deter the conclusion. There is no principled basis for today's decision, but there is a point: to make it more difficult to convict those who acknowledge their guilt with full knowledge of their rights. I respectfully dissent.

I

Contrary to the lead opinion's conclusory assertion that "[t]he Fifth and Fourteenth Amendments of the United States Constitution protect a defendant's federal rights to remain silent and to counsel," *ante* at 602, these rights cannot be found in the actual text of either amendment. The Fifth Amendment in its entirety states:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment

---

[4] *Ante* at 610.

of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any Criminal Case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

This amendment affords many rights, but not a right to counsel or a right to remain silent. The Fourteenth Amendment is equally barren soil in which to ground such rights, and its only purported function in this case is to serve as a conduit for applying the Fifth Amendment to the states. See *Malloy v Hogan*, 378 US 1; 84 S Ct 1489; 12 L Ed 2d 653 (1964).

The genesis of the "right to remain silent" is found in *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), not the Fifth Amendment. In 1966, three years after the current Michigan Constitution was ratified, the United States Supreme Court in *Miranda* created a prophylactic set of warnings to ensure protection of Fifth Amendment rights. *Michigan v Tucker*, 417 US 433, 444; 94 S Ct 2357; 41 L Ed 2d 182 (1974). If properly administered and validly waived, the *Miranda* warnings ensure protection of a defendant's right against compulsory self-incrimination, while at the same time allowing the police to fulfill their duty in a constitutionally permissible manner. The warnings and rights delineated in *Miranda*, however, are not constitutionally required, and the rights to counsel and silence are only suggested as one possible formula for dispelling the coercive atmosphere the Court found present in custodial interrogation.

The *Miranda* Court developed its formulation as one possible method of informing a defendant that the state could not force him to incriminate himself.

> The Fifth Amendment confers a right not to be compelled to answer questions; it does not confer a substantive or formal right of silence. Concededly, the former right does give rise to a right of silence in "the very weak sense" that a person has "a right to silence on every subject": a person who cannot lawfully be coerced into speaking can, of course, remain silent. [Grano, Confessions, Truth, and the Law (Ann Arbor: The University of Michigan Press, 1993), pp 141-142.]

A right to remain silent is not the same as the right to be free from compelled self-incrimination. That difference goes beyond mere semantics. If there were a constitutional "right to remain silent," a statement that was obtained in violation of *Miranda*, or before notice of such rights could be given, would be inadmissible not only in the prosecution's case in chief, but in all phases of the trial. The United States Supreme Court has explicitly rejected this blanket limitation, however, and endorsed the use of both prearrest silence and statements taken in violation of *Miranda* for purposes of impeachment. *Harris v New York*, 401 US 222; 91 S Ct 643; 28 L Ed 2d 1 (1971); *Jenkins v Anderson*, 447 US 231; 100 S Ct 2124; 65 L Ed 2d 86 (1980). See also *People v Cetlinski*, 435 Mich 742; 460 NW2d 534 (1990). If there were a constitutional "right to silence," these statements could not be used to impeach in the case in chief. As Professor Grano notes, the Fifth Amendment precludes only compelled self-incrimination and does not guarantee a right to silence, and he comes to the fairly

"unremarkable conclusion that the Fifth Amendment actually means what it says." *Id.* at 143.

The corresponding guarantee against compelled self-incrimination found in art 1, § 17 of the Michigan Constitution provides no greater protection than the Fifth Amendment. In *Sitz v Dep't of State Police*, 443 Mich 744; 506 NW2d 209 (1993), this Court reaffirmed that it is this Court's duty to interpret the Michigan Constitution. Our review may lead us to conclude that our constitution provides greater, equal, or lesser protection than its federal counterpart. "[W]e may not disregard the guarantees that our constitution confers on Michigan citizens merely because the United States Supreme Court has withdrawn or not extended such protection." *Id.* at 759.

That duty does not authorize the "unprincipled creation of state constitutional rights that exceed their federal counterparts," *Sitz, supra* at 763, nor does it mandate that we ignore the rich body of federal law the United States Supreme Court has created through analysis of corresponding provisions in the federal constitution. Although we have repeatedly concluded that our constitution should be interpreted differently only if there is a compelling reason for doing so, *id.* at 763; *People v Nash*, 418 Mich 196; 341 NW2d 439 (1983), the lead opinion is not hindered by traditional principles of constitutional interpretation.

The following factors are relevant in determining whether there is a compelling reason to interpret that our constitution affords protection different from the federal constitution:

    1) the textual language of the state constitution, 2) significant textual differences between parallel provisions of the two constitutions, 3) state constitutional and common-law

history, 4) state law preexisting adoption of the relevant
constitutional provision, 5) structural differences between
the state and federal constitutions, and 6) matters of pecu-
liar state or local interest. [*People v Collins*, 438 Mich 8, 31,
n 39; 475 NW2d 684 (1991), citing *People v Catania*, 427
Mich 447, 466, n 12; 398 NW2d 343 (1986); *Sitz, supra* at
763, n 14.]

Employing this methodology, analysis of the Fifth
Amendment and art 1, § 17 of the Michigan Constitu-
tion indicates that there is no justification, compelling
or otherwise, for construing these provisions differ-
ently. First, the relevant language in each provision is
identical,[5] and has been identical since the incorpora-
tion of a provision against compulsory self-
incrimination in the Michigan Constitution in 1850.
Const 1850, art 6, § 26. Moreover, there is nothing in
the record of the 1961 Constitutional Convention that
would indicate any intent to engraft a different inter-
pretation than that embodied in the Fifth
Amendment.[6]

Second, opinions of this Court have repeatedly indi-
cated that the protection against compulsory self-
incrimination found in our constitution is identical to
its federal counterpart. Over ninety years ago, this

---

[5] The federal provision, in relevant part, states: "No person . . . shall
be compelled in any Criminal Case to be a witness against himself . . . ."
The parallel Michigan provision, in relevant part, states: "No person shall
be compelled in any criminal case to be a witness against himself . . . ."

[6] Article 1, § 17, was amended in the 1963 Constitution to include the
following provision:

> The right of all individuals, firms, corporations and voluntary
> associations to fair and just treatment in the course of legislative
> and executive investigations and hearings shall not be infringed.

Defendants in this case do not argue, however, that this additional lan-
guage had any effect on the protection against self-incrimination.

Court first examined the federal and state provisions against compelled self-incrimination. In *In re Moser*, 138 Mich 302; 101 NW 588 (1904), a witness who was called before a grand jury was held in contempt for failing to turn over certain corporate records. The witness claimed that the protection against self-incrimination found in both the Fifth Amendment and the corresponding Michigan provision—at that time art 6, § 26—guaranteed him the right to withhold the records. In concluding that the witness had no such right, this Court stated:

> Under the Constitutions of Michigan and the United States, no witness can be compelled to give testimony which might tend to criminate himself or expose him to a criminal prosecution. *The provision in each Constitution is the same. [Id.* at 305 (emphasis added).]

More recently, in a case that is factually similar to *Moser*, this Court again squarely addressed the claim that the Michigan Constitution provides greater protection than the federal constitution. In *Paramount Pictures Corp v Miskinis*, 418 Mich 708; 344 NW2d 788 (1984), the defendants argued that compelled production of business records in a civil suit violated their privilege against self-incrimination because the records could be used against them in a subsequent criminal prosecution. This Court concluded that a corporate custodian of documents cannot assert a privilege against self-incrimination for documents that relate to the corporation. The privilege is personal, only applies to natural persons, and cannot be asserted on behalf of another. The defendants argued that, although production of the documents might not be "protected under the federal constitution, it is pro-

tected under the Michigan Constitution, Const 1963, art 1, § 17 . . . ." *Id.* at 725. In rejecting that argument, this Court stated:

> Having examined prior decisions of this Court, we find nothing which requires an interpretation of our constitutional privilege against self-incrimination different from that of the United States Constitution. [*Id.* at 726.]

Thus, previous decisions of this Court illustrate a solid and unwavering line of authority for interpreting our protection against self-incrimination identically with the federal guarantee.[7]

We examined the relationship between the Michigan and federal provisions most recently in *People v Wright*, 441 Mich 140; 490 NW2d 351 (1992). The facts in that case presented the exact issue that we address in this case. In *Wright*, the defendant was taken into custody, and the police properly informed him of his *Miranda* rights. He agreed to waive these rights and make a statement. The police, however, did not immediately take his statement, but continued to investigate the case for approximately another four hours. During this four-hour period, the defendant was confined without food or water in a fairly small room. Eventually, the police took the defendant's statement after he had been in custody for approximately nine hours.

When the defendant was apprised of his rights, he agreed that he understood them and told the officers that he did not have an attorney. Although the officers informed the defendant that an attorney would be appointed for him if he so desired, they did not tell

---

[7] Const 1963, art 1, § 17.

him that his family had hired an attorney and that the attorney had been attempting to contact him.

Before trial, the defendant filed a motion to suppress his statement. At the suppression hearing, the trial judge found that the "defendant wanted to make a statement and never explicitly asked for a lawyer." *Id.* at 145. Moreover, the trial judge concluded that the United States Supreme Court opinion in *Moran v Burbine*, 475 US 412, 430; 106 S Ct 1135; 89 L Ed 2d 410 (1986), was directly on point and that, although the police behavior may have been "reprehensible," the law did not require suppression of the defendant's statement. The Court of Appeals affirmed, and this Court granted leave to appeal.

The case resulted in a fragmented decision with four separate opinions. Justices LEVIN and MALLETT would have found that the Michigan Constitution provided greater protection than that provided by the Fifth Amendment. *Wright, supra* at 154-155. Chief Justice CAVANAGH agreed with Justices LEVIN and MALLETT but went on to state that the police conduct violated the defendant's right to counsel under Const 1963, art 1, § 20. Justice BRICKLEY's opinion focused on the defendant's due process claim and found that the defendant's confession was involuntary because of the coercive nature of his interrogation. Finally, Justices RILEY, GRIFFIN, and BOYLE would have construed the scope of the protection afforded by the Michigan Constitution identically with that of the Fifth Amendment guarantee.

The lead opinion mischaracterizes what this Court "held" in *Wright*. Although the opinions of Justice MALLETT and Justice BRICKLEY can be manipulated to state "that the Michigan Constitution imposes a

stricter requirement for a valid waiver of the rights to remain silent and to counsel than imposed by the federal constitution," *ante* at 611, four justices could not agree on why the Michigan Constitution imposes a more stringent standard.

As the lead opinion acknowledges, determining whether a defendant properly waived the rights conveyed in the *Miranda* warnings involves a bifurcated inquiry: 1) was the waiver voluntary, and 2) was the waiver knowing and intelligent? *Ante* at 603. The United States Supreme Court explained in *Moran v Burbine*:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [*Id.* at 421, quoting *Fare v Michael C*, 442 US 707, 725; 99 S Ct 2560; 61 L Ed 2d 197 (1979).]

The voluntary and knowing and intelligent prongs involve significantly different inquiries. Assuming, arguendo, that the Michigan Constitution provides a more stringent standard than its federal counterpart for determining whether a waiver was voluntary—a premise with which I wholeheartedly disagree—there is no justification for the proposition that the knowing and intelligent inquiry is also more exacting.

Close scrutiny of the opinions of Justice MALLETT and Justice BRICKLEY in *Wright* illustrate the fallacy in

the lead opinion's broad assertion regarding waiver in general without regard for the dual prongs of the inquiry. Both Justice BRICKLEY and Justice MALLETT concluded that Wright's confession was improper because it was not *voluntary*. *Wright, supra* at 153 (MALLETT, J.); *id.* at 164 (BRICKLEY, J.). Justice MALLETT also asserted that Wright's confession was not "knowing and intelligent," but he framed the issue: "whether defendant's statements were voluntary under the totality of the circumstances." *Id.* at 147. Justice BRICKLEY's opinion never mentions the terms "knowing and intelligent," and even goes so far as to state:

> In sum, voluntariness forms the touchstone of the inquiry concerning the validity of the waivers made while in police custody. [*Id.* at 168.]

Thus, if there is any support for the proposition that the Michigan Constitution requires a more demanding standard, the increased stringency has been engrafted only onto the voluntariness inquiry. This issue was not addressed in *Moran*, where the Court explicitly stated "[t]he voluntariness of the waiver is not at issue." *Id.* at 421. There is no support for the conclusion that the United States Supreme Court or this Court has adopted a more stringent standard for the "knowing and intelligent" prong of the waiver analysis.[8]

---

[8] The lead opinion's contention in n 13, *ante* at 611, that *Wright* addressed the knowing and intelligent prong of the waiver inquiry continues to ignore the fact that only three justices agreed with the statement from *Wright* that is quoted in n 13. The quoted material is found on page 155 of *Wright*. This is a portion of Justice MALLETT's opinion that only garnered the votes of Justice LEVIN and Justice CAVANAGH.

The lead opinion admits that "[b]ecause there was no evidence of police coercion, we agree with the trial court that neither defendant's statement was involuntary, and thus need not be suppressed for that reason." *Ante* at 604. If the statements were not involuntary, and, if, as Justice BRICKLEY concluded, voluntariness is the "touchstone" for determining whether a waiver is valid, the confessions in this case are not constitutionally deficient under Justice BRICKLEY's opinion in *Wright.*

The opinion on which the lead opinion relies, Justice MALLETT's opinion in *Wright,* focused on the voluntary prong of the waiver requirement. Although there is language addressing the knowing and intelligent prong of the waiver, this opinion suffers the same infirmities that plague the majority opinion in the present case. The fact that there may be policy reasons to support informing a suspect that counsel would like to speak with him, and that other states may find such a requirement in their constitutions is irrelevant. The self-restraint imposed by limiting recognition of new rights through a principled analysis express this Court's commitment to the organic instrument of state government. If there is no reasoned basis for concluding that art 1, § 17 imposes more stringent requirements than the Fifth Amendment, recognition of such a right is simply an unprincipled declaration by this Court of its power in the premises.[9]

---

[9] The interaction between a state constitutional guarantee against compelled self-incrimination and the Fifth Amendment was recently addressed by the Illinois Supreme Court. *People v McCauley,* 163 Ill 2d 414; 645 NE2d 923 (1994). In *McCauley,* a majority concluded that the Illinois Constitution provided greater protection than the Fifth Amendment. Although the dissent argued that the cases relied on by the majority did not estab-

The lead opinion, without constitutional analysis or judicial support, declares by judicial fiat that "we reiterate that our state constitution affords defendants a greater degree of protection in this regard than does the federal constitution." *Ante* at 614-615. As Justice COOLEY in his treatise explained over one hundred years ago:

> A constitution is not to be made to mean one thing at one time, and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable. A principal share of the benefit expected from written constitutions would be lost if the rules they established were so flexible as to bend to circumstances or be modified by public opinion. . . . What a court is to do, therefore, is *to declare the law as written,* leaving it to the people themselves to make such changes as new circumstances may require. The meaning of the constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it. [Cooley, Constitutional Limitations (6th ed), pp 68-69.]

The restrictions the lead opinion attributes to art 1, § 17 rest only on its belief that a different interpretation is more "desirable" than that set forth in the constitution or in our previous decisions. A belief that the law as we would write it is more desirable than the law as written has no place in constitutional interpretation, or in the faithful adherence to our oath of office.

---

lish a difference between the Illinois Constitution and the Fifth Amendment, the majority in that case, unlike the majority in this case, at least attempted to justify the departure by analyzing the constitutional convention dialogue and previous Illinois opinions.

The two provisions guarantee the same level of protection because "[t]he provision in each Constitution is the same,"[10] and there is no "compelling reason" for interpreting the identical provisions differently.

II

Having concluded that the protection against compelled self-incrimination in the Michigan Constitution should be construed the same as its federal counterpart, we now examine whether the Fifth Amendment would invalidate defendants' *Miranda* waiver. It does not.

> [I]t is . . . axiomatic that the [Fifth] Amendment does not automatically preclude self-incrimination, whether spontaneous or in response to questions put by government officials. "It does not preclude a witness from testifying voluntarily in matters which may incriminate him," *United States v Monia*, 317 US 424, 427 [63 S Ct 409; 87 L Ed 376] (1943), for "those competent and freewilled to do so may give evidence against the whole world, themselves included." [*United States v Washington*, 431 US 181, 186-187; 97 S Ct 1814; 52 L Ed 2d 238 (1977), quoting *United States v Kimball*, 117 F 156, 163 (CC SD NY, 1902).]

The lead opinion's conclusion that defendants did not make a knowing and intelligent waiver of their *Miranda* rights because the police failed to inform them that attorneys hired for them by their parents attempted to contact them before making their statements is not required by the federal constitution. *Moran v Burbine*. In fact, the majority's conclusion

---

[10] *Moser, supra* at 305 (emphasis added).

was expressly rejected by the United States Supreme
Court in *Moran*.

The United States Supreme Court, in *Moran*,
addressed the very issue we are presented with today.
The Court concluded that the police violated neither
*Miranda* nor the federal constitution when they
obtained a confession from a suspect after securing a
valid *Miranda* waiver, but without informing him that
a lawyer retained by his sister had telephoned the
police station, offering to represent him if he was
questioned.

In *Moran*, the defendant was arrested and properly
informed of his *Miranda* rights. After voluntarily sign-
ing three written waivers of these rights and never
requesting counsel, the defendant admitted that he
had committed a murder.

Meanwhile, shortly after the defendant was
arrested, and before the police began to question him,
a public defender, who had been contacted by the
defendant's sister, called the police station and
inquired whether the police intended to question the
defendant that evening. In response, the police stated
that they were not going to question the defendant
that night. Throughout the interrogation, the defend-
ant was unaware that his sister had retained an attor-
ney or that the attorney had called.

Before trial, the defendant moved to suppress his
confession. The trial court denied the motion and
concluded that the waiver was voluntarily and know-
ingly made. At trial, the defendant was convicted of
murder.

The defendant's conviction was affirmed by the
Rhode Island Supreme Court, and the United States
District Court for the District of Rhode Island denied

his habeas corpus petition. The United States Court of Appeals for the First Circuit reversed the defendant's conviction, and the United States Supreme Court granted leave to appeal.

On appeal, the United States Supreme Court reinstated Burbine's conviction, concluding that failure by the police to inform the defendant that his sister had retained counsel for him did not deprive him of his right to counsel or render his *Miranda* waiver invalid. The Court emphasized that *Miranda* imposes on police an obligation to "inform [a suspect] of his rights to remain silent and to 'have counsel present . . . if [he] so desires.'" *Id.* at 468-470. "Beyond this duty to inform, *Miranda* requires that the police respect the accused's decision to exercise the rights outlined in the warnings." 475 US 420. *Moran* reaffirmed that a suspect may waive his rights under *Miranda*, as long as that waiver is voluntary, knowing, and intelligent.

After noting that the voluntariness of the waiver was not at issue, the Court found that there was no question concerning the defendant's understanding of the *Miranda* warnings and of the consequences of waiving them. The Court held that the information withheld from the defendant did not affect the knowing and intelligent nature of his waiver. It reasoned:

> Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. . . . [W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights. Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could

stand mute and request a lawyer, and that he was aware of
the State's intention to use his statements to secure a con-
viction, the analysis is complete and the waiver is valid as a
matter of law. [475 US 422-423 (citations omitted).]

The *Moran* majority also emphasized that, if the
police inform a suspect of his *Miranda* rights and
ensure that the suspect waives those rights know-
ingly, voluntarily, and intelligently, any other police
conduct, or misconduct, is then irrelevant. "[S]uch
conduct is only relevant to the constitutional validity
of a waiver if it deprives a defendant of knowledge
essential to his ability to understand the nature of his
rights and the consequences of abandoning t̄ em."
*Moran, supra* at 424.

The *Moran* Court declined to extend the prophylac-
tic *Miranda* warnings to include the duty to inform a
suspect that an attorney is attempting to contact him.
The Court indicated reluctance to muddy *Miranda*'s
clear waters and indicated concern over shifting
*Miranda*'s delicate balance between the societal
value of confessions and the need to protect against
the inherently coercive environment of police interro-
gation. 475 US 425. Although, as pointed out by the
majority, *Moran* acknowledged that states were free
to adopt different standards if they so chose, 475 US
428, the United States Supreme Court by definition
could only mean that federal law did not preclude the
adoption of different rules. The Court could not and
did not address the authority of state supreme courts
to interpret their own governing law.

Finally, the Court flatly refused to accept that the
Sixth Amendment right to counsel is in any way
implicated at the custodial interrogation stage of pro-

ceedings. It reemphasized as well that any constitutional support for *Miranda* lies solely in the Fifth Amendment right against compelled self-incrimination.

Like *Miranda, Moran*'s rationale and holding reflects the careful balance struck between protection of an incarcerated defendant, and the legitimate law enforcement objectives of society. Professor Yale Kamisar, who has defended *Miranda* in the face of its critics and criticized the United States Supreme Court for cutting back on that opinion, supports *Moran*. He states:

> It is hard to believe that [the *Miranda*] Court would consider the now-familiar warnings insufficient when—even though a suspect has been adequately advised of his rights and has effectively waived them, thus expressing a willingness to talk to the police without a lawyer—a lawyer whose services the suspect has not sought has, unbeknown to him, entered the picture. [Kamisar, *Remembering the "old world" of criminal procedure: A reply to Professor Grano*, 23 U Mich J L Ref 537, 581 (1990).]

The guiding principle of *Moran* is that outside events have no effect on whether a waiver of *Miranda* rights is knowing and intelligent. The United States Supreme Court underscored this point in *Colorado v Spring*, 479 US 564, 577; 107 S Ct 851; 93 L Ed 2d 954 (1987), stating, "the additional information could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature." Thus, the Court concluded that the withholding by the police of certain information from the suspect did not affect his waiver decision "in a constitutionally significant manner." *Id.*

### III

What a majority of the Court is really saying in this case has nothing to do with whether defendants knowingly and intelligently waived their *Miranda* rights. Having been advised of and having agreed that they understood their rights, defendants, by definition, knew they had a right to have counsel present, in the room, and chose not to exercise that right. Rather, the point of both the lead opinion and Chief Justice BRICKLEY's opinion is that had defendants known an attorney was "attempt[ing] to contact them," *ante* at 614, they probably would have chosen to consult with that attorney, who likely would have advised them not to confess. However, if in fact there is a subjective difference in the suspect's mind between knowing that he has the right not to speak without an attorney present and knowing that a retained attorney is trying to contact him, it is a difference that the *Miranda* warnings already address.

Contrary to the rationale of the Connecticut court on which the lead opinion relies, *Miranda* advice is not an abstract offer to call some unknown lawyer, it is an offer to have an attorney of one's choice present during questioning. Thus, although the lead opinion speculates that defendants might not have made a statement had they known an attorney was going to be available (immediately, within an hour, within several hours), this is exactly the kind of information that would have been produced had defendants exercised their options under *Miranda* to ask questions and request their attorneys.[11] Both the lead opinion

---

[11] The reference to incommunicado interrogation is similarly puzzling. Interrogation is not "incommunicado" if one knows that one has a right to

and Chief Justice BRICKLEY's opinion benefit those suspects who already have retained counsel—the very suspects who currently exercise that option. Experience teaches that it is precisely those persons, educated and well enough off to retain an attorney, who are most likely to exercise their rights at precisely this point and to ask the police to contact their counsel. That a suspect may later regret that he did not choose to wait for the appearance of counsel of his choice does not affect the voluntariness of the choice. Nor does it logically support the conclusion that defendants would have foregone the opportunity to speak if they knew that their attorneys were "on [their] way." As stated by the United States Supreme Court, "the Constitution does not forbid 'every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights.'" *Jenkins v Anderson*, 447 US 231, 236; 100 S Ct 2124; 65 L Ed 2d 86 (1980), quoting *Chaffin v Stynchcombe*, 412 US 17, 30; 93 S Ct 1977; 36 L Ed 2d 714 (1973).[12]

---

have an attorney present during interrogation and may exercise that right at any time.

[12] The "evil" a majority of this Court seeks to prevent is not coercion, but the confession, which the attorney will either advise the client he should not make or prepare to defend himself against claims of ineffectiveness or malpractice.

What the rule does is add another prophylactic right to the *Miranda* litany destined not to be a prophylactic right, but a preclusive stopper. The right to be informed of the presence of counsel has no bearing on whether the waiver is knowing or voluntary; instead, it is a new right added to those enumerated in *Miranda*. The police must now inform a suspect about to undergo custodial interrogation that he has the right to remain silent, that anything he says may be used as evidence against him, that he is entitled to the presence of an attorney, either retained or appointed, and that an attorney has been retained for him and has attempted to contact him.

In its haste to create a novel "*Miranda*-like right[ ],"[13] a majority of the Court blurs the distinction between the constitutional right to be free from compelled self-incrimination and the safeguards—*Miranda* warnings—created to protect that right. In effect, a majority of the Court creates prophylactic rules to protect prophylactic rights. The argument seems to be that it is necessary to inform a suspect that an attorney is attempting to contact him, which, in turn, effectuates the suspect's right to counsel, which, in turn, effectuates a suspect's right to remain silent, which, in turn, effectuates a suspect's right to be free from compelled self-incrimination. Safeguards for safeguards is absurd and is not required by the Michigan Constitution, the federal constitution, or *Miranda*.

Given, for the reasons stated above, that neither the Michigan nor the federal constitution require extension of the *Miranda* litany, the majority's only possible justification for requiring the police to inform a suspect that an attorney wishes to speak with him must be grounded solely on policy concerns, not constitutional mandates. But policy concerns also fail under proper analysis.

Most problematic of all is the majority rule's disruption of the delicate balance reached in *Miranda* between law enforcement's need for confessions and the suspect's need for protection against coercion. The holding in *Miranda* is a compromise between the state's position that the due process voluntariness

---

[13] The "duty to inform" a suspect that an attorney would like to speak with him is not required by the constitution or *Miranda*. Thus, defendant Bender's brief aptly refers to this novel requirement as a "*Miranda*-like right[ ]."

standard adequately protects rights and the competing position that only the presence of a lawyer will eliminate the coercion of custodial interrogation. The majority comes down against law enforcement, believing that a holding to the contrary "would encourage the police to do everything possible, short of a due process violation, to prevent an attorney from contacting his client before or during interrogation."[14] *Id.* at 615. There is no constitutional harm.[15] If the police have done everything required by *Miranda* to effectuate a suspect's right to choose not to speak, there is no due process violation; and if the "client" has not asked for an attorney even though he knows he has a right to the presence of counsel, what and whose rights are in jeopardy? Having thus created a paper tiger, however, a majority of the Court seeks to prevent the nonexistent constitutional violation and suppress all voluntarily given statements by saving the suspect from his own choice. What neither the lead opinion nor Chief Justice BRICKLEY's opinion recognizes, however, is that "[i]f all harsh, painful, or

---

[14] The lead opinion goes on to state:

> Once the suspect signed the waiver form, police could interrogate the suspect in isolation, without the assistance of his own lawyer, even if that lawyer is making an actual effort to consult with the suspect. [*Ante* at 615.]

Interestingly enough, it would be very difficult to characterize counsel in this case as the suspect's "own lawyer." There was no attorney-client relationship in either case, and neither defendant requested counsel. Unlike the picture the majority attempts to paint of a suspect and an attorney desperately trying to contact each other, the real scenario is the picture of a desperate lawyer attempting to contact a potential client.

[15] The lead opinion's quotation from *Miranda* is tautological. The government has not " 'become[ ] a lawbreaker,' " *ante* at 615, n 19, until this Court says that it is the law that a suspect must be rescued from his own choice.

intrusive means of law enforcement were prohibited, law enforcement would be impossible."[16]

> Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable. In addition to guaranteeing the right to remain silent unless immunity is granted, the Fifth Amendment proscribes only self-incrimination obtained by a "genuine compulsion of testimony." *Michigan v Tucker, supra,* 417 US 440. Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions. [*Washington, supra* at 187.]

The majority's imposition of an affirmative obligation on the police to offer more information than that required by *Miranda* will inevitably invite other challenges. Once the carefully crafted balance of *Miranda* is disturbed, there is no principled basis on which to stop further erosion of the rule. Perhaps the next challenge will mirror that in *Spring, supra,* where the defendant contended his waiver was not knowing and intelligent because he was not informed of the subject matter in which the police were interested or the exact use to which the information sought would be put. If a suspect cannot intelligently waive his right to the presence of counsel without calibrating information that he did not have, it might logically follow that unless he understands the particular significance of any information he gives, his waiver is equally unknowing. The majority rule likewise encourages a defendant to challenge his *Miranda* waiver because he was not informed of evidentiary developments in the case against him, a challenge rejected in *Oregon v*

---

[16] Grano, *supra* at 40.

*Elstad*, 470 US 298, 317; 105 S Ct 1285; 84 L Ed 2d 222 (1985).

Similarly, the majority's new requirement does not lend itself to easy administration. While *Miranda* rights must be read to every suspect about to undergo custodial interrogation, whether a suspect must be informed of the majority's rule depends on the circumstances. Consequently, it raises serious questions of application. The majority's rule requires that the police inform a suspect that an attorney wishes to see him " 'whether that request comes over the police station counter, over the telephone, or via messenger.' " *Ante* at 618, quoting *People v Houston*, 42 Cal 3d 595, 615; 230 Cal Rptr 141; 724 P2d 1166 (1986) (Bird, C.J., concurring in part and dissenting in part). This rule opens Pandora's box with respect to challenges:

> [T]he duty of police to inform a suspect that an attorney seeks to communicate with the suspect raises a number of other issues that the Court will surely need to address before long. For example, how quickly must the police relay the information that an attorney is available? If an attorney calls the police station, is the officer receiving the call obliged immediately to put aside all other matters and race to inform the investigating officers? Does the right attach at the time of communication or at some reasonable time thereafter? If the suspect should blurt out a confession a moment before an officer seeking to impart the availability of counsel enters the room, does the statement become retroactively involuntary even though the police made every effort to honor a defendant's rights? . . .
>
> Also, what duty do police officers have to provide full and accurate information concerning the attorney's identity? . . . And we will eventually have to wrestle with the nasty little issue of whether a negligent misstatement of the information concerning that attorney would have any effect on a subsequent waiver. [*State v Reed*, 133 NJ 237, 280-281; 627 A2d 630 (1993) (Clifford, J., dissenting).]

As the dissent in *Reed* illustrates, the majority's rule will disturb *Miranda*'s clear, bright-line rule. An officer may no longer rest assured that as long as he reads the *Miranda* litany to the suspect, and the suspect informs him that he understands them and waives them, that he has adequately protected the suspect's rights under the Fifth Amendment. Now, a seemingly valid waiver will always be open to challenge.

The majority compounds its error by holding that a waiver is invalid per se if a suspect is not informed of an attorney's attempted contact. This is contrary to *Miranda* itself and to our own precedent, both of which require the waiver inquiry to be resolved by considering the totality of the circumstances. 384 US 475; *People v Cipriano*, 431 Mich 315; 429 NW2d 781 (1988); see also *Fare v Michael C, supra* at 724-725 (holding that the totality of the circumstances test applies when determining whether a juvenile waived his *Miranda* rights). The totality of the circumstances test is preferable to a rule per se because "a waiver of rights may or may not, depending on the totality of the circumstances, be vitiated by the failure of the police to fulfill their responsibility to inform the suspect." *State v Stoddard*, 206 Conn 157, 163; 537 A2d 446 (1988).

To support creation of an exclusionary rule per se, the lead opinion reasons as follows:

> "When the opportunity to consult counsel is in fact frustrated, there is no room for speculation what defendant might or might not have chosen to do after he had that opportunity." *State v Haynes*, 288 Or 59, 75; 602 P2d 272 (1979). The right to counsel becomes meaningless if a suspect cannot communicate with his attorney or can only

speak with him after the suspect has given a statement.
[*Ante* at 617.]

Close examination of these two sentences, however,
reveals that the lead opinion focuses on the wrong
person in the attorney-client relationship. The privi-
lege against self-incrimination is personal to the sus-
pect. *United States v Scarpa*, 897 F2d 63, 69 (CA 2,
1990); *People v Ledesma*, 204 Cal App 3d 682, 694;
251 Cal Rptr 417 (1988).[17] Likewise, a person's rights
under *Miranda* may not be invoked by a third party.
Failure to inform the suspect that an attorney would
like to speak with him no more "frustrates" the sus-
pect's right to consult with counsel than if counsel
had accompanied his client to the police station and
was sitting outside the interrogation room. Rather, it
"frustrates" the attorney's attempts to consult with
the suspect. More precisely, it frustrates the interest
of the third party who has retained the attorney, or
the interests of those who hold the view that confes-
sions and admissions are not socially desirable. Like-
wise, suggesting that the right to counsel would be
"meaningless if a suspect cannot communicate with
his attorney" focuses on the attorney, not the suspect.
The right to counsel is not "meaningless" if the attor-
ney cannot communicate with a suspect because the

---

[17] See also *Moran, supra* at 433, n 4:

The dissent also launches a novel "agency" theory of the Fifth
Amendment under which any perceived deception of a lawyer is
automatically treated as deception of his or her client. This argu-
ment entirely disregards the elemental and established proposition
that the privilege against self-incrimination is, by hypothesis, a per-
sonal one that can only be invoked by the individual whose testi-
mony is being compelled.

suspect has not indicated a desire to speak with the attorney. By contrast, the prophylactic protections created by *Miranda* were intended to protect suspects, not their families, their principals in crime, or their attorneys.[18]

The majority rule might also raise serious equal protection concerns. Suspects who have a retained attorney whom they can call on a moment's notice, or who have supportive, wealthy families who know attorneys personally, obtain the benefit of the result of the majority opinion. Other beneficiaries include "professional criminals" who have previously had contact with the law. Indigent suspects, however, who have had no previous experience with law enforcement, will receive no assistance from the holding of the majority. As eloquently stated by the dissent in *Reed*:

> [T]he Court's rule creates an illogical or unfair advantage for some suspects. Those suspects who are taken into custody in the presence of others, or who have previously obtained a private attorney, or who have previously required the services of a public defender—and therefore are more likely to be the beneficiaries of someone's call to an attorney on their behalf—will be found to have been coerced if not alerted should an attorney arrive at the station house. On the other hand, the indigent defendant with no previous experience with law enforcement who is arrested while alone—and hence "out of the loop" as far as legal assistance is concerned—although subjected to identical interrogation techniques will have knowingly and voluntarily waived the right to counsel. The rule therefore results in two classes of suspects and favors those who are more

---

[18] The majority overlooks the real possibility that the rule it adopts will increase the strength of the best organized criminals to control its more vulnerable links.

likely to have access to counsel. Such intolerable incongruities result when the emphasis shifts to *events* entirely unrelated to the suspect's knowledge rather than focusing on the sole person who matters in evaluating the validity of a suspect's waiver—the *suspect*. [133 NJ 279 (Clifford, J., dissenting).]

The unequal treatment created by the majority, however, may be short-lived. Today's ruling will invite an indigent suspect to challenge the rule on equal protection grounds, claiming that the *Miranda* litany must be expanded to include the admonition that not only do you have a right to a free attorney if you cannot afford one, but that a free attorney is presently available and wants to talk with you. The majority is chargeable with knowledge that, given such an argument, the extreme position advocated in an amicus brief in *Miranda*—that the actual presence of counsel is necessary to dispel the coercion inherent in custodial interrogation—may become the law in Michigan. By opting for less intrusive warnings, the *Miranda* Court rejected that position. So should we.

IV

The trial court found that "each defendant had made a voluntary statement with full knowledge of his *Miranda* rights," 208 Mich App 221, 226; 527 NW2d 66 (1994), but believed that under *Wright*, the police committed a fatal error in failing to inform the defendants that an attorney was retained for them. Thus, the trial court concluded that the waivers were not knowing, and the confessions were suppressed. The Court of Appeals affirmed, reasoning that the rationale used in *Wright* by either Chief Justice CAVANAGH or Justice MALLETT would support sup-

pressing the confessions.[19] The majority affirmed the suppression of the confessions, albeit on slightly different grounds.

Given the lead and concurring opinion's desire to find the waivers unknowing, noticeably and understandably absent from either opinion is any reference to defendants' testimony at the suppression hearings. Analyzed properly, there is no question that the defendants understood their rights under *Miranda* and knowingly and intelligently waived those rights.[20]

> Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law. [*Moran, supra* at 422.]

At the suppression hearings, both defendants testified that they read, understood, and signed the *Miranda* waiver forms.[21] There is no allegation that

---

[19] As explained above, however, there were not four votes for any rationale in *Wright*. Justice BRICKLEY, who concurred in the result and provided the Court's fourth vote in *Wright*, only examined whether failure to inform a suspect that an attorney wished to contact him rendered the confession involuntary, but said nothing about the knowing and intelligent prong of the waiver requirement.

[20] To reemphasize, neither defendant has argued that his waiver was involuntary.

[21] Defendant Bender was asked the following questions by the prosecutor:

> *Q. (Interposing)*: Mr. Bender, there's no question before you, sir. I place in front of you Exhibit number 2. Do you recognize that?
> *A.* Yes. This is the *Miranda* form with my signature.
> *Q.* And you understood that when you read it?
> *A.* Yes, I believe so.
> *Q.* Did you understand it when you read it that night?
> *A.* Yes.
> *Q.* And you understand it today?

defendants did not comprehend the substance of the

---

*A.* Yes.

*Q.* And you don't suffer from any sort of reading disability such as dyslexia or anything of that nature?

*A.* No.

The prosecutor also questioned defendant Zeigler:

*Q.* Mr. Zeigler, I have placed in front of you what's been marked as Exhibit number 3. Do you recognize that?

*A.* Yes, I do.

*Q.* Is that your signature on there?

*A.* Yes, it is.

*Q.* And that's the waiver of rights form?

*A.* Correct.

*Q.* Is that your normal signature?

*A.* Pretty much it is. It's a little sloppy but yeah.

*Q.* Your hand wasn't shaking so bad you couldn't sign your name or anything like that, was it?

*A.* No.

*Q.* Okay. You can set that aside. Did you understand that? You read it out loud; is that correct?

*A.* Yes. I read it to the detective.

*Q.* And you understood it?

*A.* Yes.

*Q.* You sound a little hesitant?

*A.* Well, I understood what—I had seen t.v. shows, I know what it means, that they have to do that but I suppose I didn't . . .

*Q.* (*Interposing*): Well, what didn't you understand, Mr. Zeigler?

*A.* I guess I didn't understand it at all.

*Q.* You understood, sir, didn't you that if you wanted an attorney, you could have one, you could retain one or one would be appointed for you?

*A.* Yes, I did know that.

*Q.* And you understood that you didn't have to answer any questions without a lawyer being present unless you wanted to?

*A.* Correct.

*Q.* And you also understood that if at any time during the conversation of the detectives you wanted to stop the questioning, you could do so?

*A.* Yes.

*Q.* But instead, you chose to talk to the detectives; is that correct?

*A.* I did, yes.

rights provided by *Miranda.* There is no basis to question either defendant's cognitive ability; both were attending college and doing well.[22] Both testified that they knew they had a right to an attorney.[23] Defendants clearly understood that the police intended to

---

[22] The prosecutor continued questioning defendant Bender:

> *Q.* And were you attending college?
> *A.* Yeah. I was going to school during the day, U of M Dearborn and working.
> *Q.* And you were in what year of college?
> *A.* It was my junior year.
> *Q.* And what were you studying or are you studying?
> *A.* I was taking prerequisites to get into the architectural program at U of M.
> *Q.* Are you in the architectural program now?
> *A.* Not this term but I was last term, and I will be returning in the fall.
> *Q.* What grade point do you have to have to get to the architectural program?
> *A.* I had a 3.1 but I don't know what you have to get.

Defendant Zeigler responded as follows:

> *Q.* How far along were you at the time in your schooling?
> *A.* Probably sophomore, credit wise.
> *Q.* And you attend Michigan or Eastern?
> *A.* Eastern and Schoolcraft.
> *Q.* And I don't want to ask this to embarrass you—I know I would have been embarrassed at some point in time, but what is your grade point?
> *A.* Currently, it's 3.2.

[23] The prosecutor continued to question defendant Bender:

> *A.* I can honestly say that I was scared at the time. I was not sure what to do, and that when presented with the *Miranda* form, I asked them, perhaps incorrectly I asked them whether or not that would be the right thing to do, given that I didn't—at the time, I was not sure that I had access to an attorney. I elected to tell them . . .
> *The Court (Interposing):* What did the form say about access to an attorney?
> *[Defendant:]* It said that I had access to an attorney.
> *The Court:* You didn't believe it?

use what they said against them because they both
testified that they told the police the truth in the hope
that the police would "go easy" on them and allow
them to go home.[24] Bender testified that he knew he
should not sign the waiver form and asked the police
for a reason why he should do so.[25] Review of the tes-

---

*The Witness*: I didn't know whether that meant that I was going
to stay—have to stay there and wait in the holding cell. I didn't
know what that—I mean . . .

*The Court (Interposing)*: You figured it might mean you would
have to wait for an attorney if you wanted one; is that right?

*The Witness*: Yes.

*The Court*: If you made the statement without an attorney, I
guess you wouldn't have to wait any longer, that's what you were
thinking?

*The Witness*: That's probably part of what I was thinking.

[24] The prosecutor asked defendant Zeigler about the first thing that hap-
pened in the interrogation room:

A. The first thing that happened was the detectives introduced
themselves and just said, "Do you want to tell us what happened
last night?" And they handed me the *Miranda* rights thing.

Q. And you read that?

A. I read that out loud.

Q. Did you understand it?

A. Yes, I understood it.

Q. And did you voluntarily sign the form?

A. I signed it but . . .

Q. Did the police say anything that encouraged you or got you to
sign the form?

A. They had gotten me—they said it would be better if I just
signed it and talked to them and told them the truth.

This factor does not adversely affect my conclusion that the defendants
properly waived their *Miranda* rights because it is true: if they talked
immediately, they could be released immediately. On the other hand, if
they requested an attorney, they would have to wait for the attorney's arri-
val, which might take much longer.

[25] Defendant Bender responded to the prosecutor's questions as
follows:

Q. Did they tell you anything else about cooperating?

timony at the suppression hearings, focusing only on what the suspects knew and understood, leads to the inexorable conclusion that both defendants knowingly and intelligently waived their *Miranda* rights. As a matter of law, this is all that is necessary for a constitutionally valid waiver.

Absent any claim of coercion, the fact that there were developments unknown to defendants—that an attorney had telephoned the station in Bender's case, or that his mother had arrived in person with the message that he was not to speak until the attorney arrived in Zeigler's case, had no bearing on whether the waivers were constitutionally sufficient. Similarly, it is irrelevant to a waiver analysis that each defendant testified that had he known an attorney had been retained for him, he would have heeded the attorney's advice.

> A waiver may be knowing and intelligent in the sense that there was awareness of the right to remain silent and a decision to forego that right, but yet not knowing and intelligent in the sense that the tactical error of that decision was not perceived. But this is no bar to an effective waiver for *Miranda* purposes, for it "is not in the sense of shrewdness that *Miranda* speaks of 'intelligent' waiver," and thus in "this context intelligence is not equated with wisdom." [1 LaFave & Israel, Criminal Procedure, § 6.9, p 527, quoting *Collins v Brierly*, 492 F2d 735, 739 (CA 3, 1974).]

---

A. When I was presented with the *Miranda* form, I wasn't sure that I wanted to sign it, and so I said, "I know that I shouldn't sign this. Why should I sign this?"

And they said that it would be easier—something to that effect if I signed it.

This reasoning applies to the *Miranda* right to an attorney as well. A suspect's choice to forgo the presence of an attorney in the interrogation room will almost always be a tactical error. It is irrelevant, however, that, with hindsight, the suspect regrets his decision and would have done differently had he had the information needed to make the best decision.

Finally, from a pure policy standpoint, it is appropriate to find a valid waiver in these cases. Defendants made a conscious choice to tell the truth to the police, rather than exercise their right to remain silent, believing as a consequence that the police would "go easier" on them and release them sooner. No societal goal is served in protecting the defendants against the consequences of their own intelligent choices.[26] Nor is it desirable to suppress a presumptively truthful statement, voluntarily made, that aids in a criminal prosecution.

Finding a waiver in these cases upholds the eminently sound principle that a truthful, uncoerced confession will be used in prosecuting crime. The majority devalues confessions, yet does not explain why "punishing people for what they reveal from their own mouths" is less acceptable than the common practice of convicting defendants using the testimony of others.[27]

To suppress these statements also hinders post-*Miranda* law enforcement. *Miranda* allows the suppression of some constitutionally obtained confessions in order to ensure that no unconstitutionally

---

[26] "[T]he interrogation environment should not be considered cruel merely because it encourages the suspect to tell the truth." Grano, *supra* at 45.

[27] Grano, *supra* at 39.

obtained confessions are admitted. The rule set forth by the majority disturbs the delicate balance created in *Miranda* between confessions, which are desirable, and coercion, which is not. The balance is now skewed not to protect against coercion, but to discourage confessions.

V

In short, there is no support in the Michigan Constitution for the rule announced today. I would adopt the holding and reasoning of *Moran v Burbine*, and consequently, would reverse the decision of the Court of Appeals.

RILEY and WEAVER, JJ., concurred with BOYLE, J.